IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHOSEN LEE,**<br><br>*Plaintiff,*<br><br>v.<br><br>**BAY, LLC, et al.,**<br><br>*Defendants.* | Case No. 2:21-cv-05088-JDW |

# MEMORANDUM

For many, uncertainty breeds anxiety. And no time in recent memory spurred more anxiety than the start of the Covid-19 pandemic. People were sick, but no one knew how bad things were or what to expect. Businesses and employees alike struggled with that uncertainty. For Chosen Lee, the uncertainty caused anxiety that she claims was debilitating. For her employer Bay, LLC, the uncertainty led to operational changes and reductions in force. Dr. Lee claims that Bay terminated her because of her anxiety, and Bay claims that it terminated her for business reasons. The record offers support for each possibility, which means that, for the most part, I will leave it to a jury to resolve this case. But there are a few points of law that require dismissal of certain claims. Most notably, that includes Dr. Lee's claims under the Philadelphia Fair Practices Ordinance because that law requires administrative exhaustion, and I have concluded that an administrative

complaint before the Pennsylvania Human Relations Commission does not satisfy that exhaustion requirement.

## I. BACKGROUND

### A. Factual History

Bay is a medical marijuana company that has dispensaries in Lancaster, Philadelphia, and Phoenixville. In 2018, Dr. Lee started working as a pharmacist at the Phoenixville location. She was a salaried employee and was eligible for bonuses. At the time, Bay had roughly 69 employees working across the three dispensaries.

Cure Solutions, LLC provides management support services to medical marijuana facilities in Pennsylvania and elsewhere. William Mackiernan is Cure Solutions's sole member and CEO. One of Cure Solutions's wholly-owned subsidiaries, Defendant Cure Pennsylvania, LLC ("Cure PA"), had a contract with Bay to provide management support services at Bay's dispensaries in Pennsylvania. Cure PA did not have any employees of its own. Instead, Cure Solutions employees performed services under the management contract. For example, Cure Solutions's employee Lorie Jansson "provid[ed] various day-to-day HR operations and guidance" to Bay, such as handling leave requests and payroll for Bay's employees. (ECF No. 35-32 at 31:5-7.) Another Cure Solutions employee, Joseph Wentzell, served as Bay's Regional Director. In that role, all Bay employees (including Dr. Lee) reported up to Mr. Wentzell, and he had the ability to hire and fire them.

In March 2020, at the outset of the COVID-19 pandemic, Defendants decided to keep the dispensaries open. Dr. Lee worried about potential exposure to COVID-19 and the steps Defendants were (or were not) taking to ensure employee safety. Early on March 16, 2020, she started expressing her anxiety over the situation. Dr. Lee emailed Mr. Wentzell at 2:54 A.M. and told him that her "heart is racing from the anxiety this situation is causing." (ECF No. 30-11 at p.3 of 7.) Mr. Wentzell understood that Dr. Lee had requested a "leave of absence," but he said he could not grant her request since the dispensary was considered to be a critical infrastructure. However, he did advise Dr. Lee that she could use some or all of her 61 hours of paid time off ("PTO"), if she wanted.

At 3:19 A.M., Dr. Lee also emailed her store manager, Gabrielle Mazza, stating: "I'm experiencing an extremely high level of anxiety regarding our current situation. Please send information regarding short term disability leave or advise where I can find the information." (ECF No. 35-11.) She followed-up with Ms. Mazza later that morning, writing: "I'm having extreme anxiety over all this. I need to see my doctor today for help with this. … If I don't feel safe enough with what they're providing for us, I'll need to take PTO and/or disability leave." (ECF No. 30-13 at p.2 of 3.) Dr. Lee also reached out to the Human Resources Director, Ms. Jansson, and asked her to "[p]lease forward information to me regarding medical leave benefits." (ECF No. 30-12 at p.3 of 3.) Ms. Jansson asked if Dr. Lee was inquiring about FMLA leave, and Dr. Lee responded: "Yes." (*Id.* at p.2 of 3.) Ms. Jansson

testified that she understood Dr. Lee to be requesting FMLA leave as of that time, and she sent Dr. Lee an FMLA form to complete a few days later.

That same day, Dr. Lee saw her health care provider, Dr. Thomas Reekie. Dr. Reekie diagnosed her with severe anxiety and prescribed her an increased dosage of Xanax to manage her symptoms. Indeed, Dr. Lee's proffered expert has opined that her anxiety had become "debilitating" by March 16, 2020. (ECF No. 35-13 at 11.) Later that night, Dr. Lee followed-up with Mr. Wentzell via email, stating:

> I could not sleep and I saw my doctor today because I need help processing the amount of the past weeks' unprotected exposure and risk of transmission to my family and to initiate FMLA. My blood pressure has spiked and new prescriptions for blood pressure and anxiety have been prescribed for me.
> ***
> I will use my PTO in order to stabilize the blood pressure and newly diagnosed anxiety with my new medications, and to monitor for covid-19 symptoms. ... In the event I still feel I am unable to return to the dispensary, will I have the option, at that time, to apply for a medical leave?

(ECF No. 30-16 at p.3 of 4.)  Mr. Wentzell testified that he understood that Dr. Lee was suggesting that she might need to be out longer than her two weeks of PTO would cover.

During this time, Defendants had been formulating various contingency plans in light of the uncertainty in the midst of a pandemic. Those plans contemplated reductions in force, reduced hours, selective closures of certain dispensaries, or total closures of all locations. On March 19, 2020, Mr. Wentzell circulated an interoffice memo to dispensary employees, directing them to "supply their availability for work to their dispensary manager by the end of the day on Saturday 3/21/2020." (ECF No. 30-22 at 2.) On March

4

22, 2020, in advance of a conference call with Ms. Jansson and Mr. Mackiernan to discuss a potential reduction in force, Mr. Wentzell sent a document titled "RIF Options in PA." That document listed each employee and the employee's availability (or unavailability) to work. It also outlined two possible reduction in force options for the dispensaries. For example, under Option 1, two salaried pharmacists would be terminated: Dr. Lee and another pharmacist from the Lancaster dispensary. Option 2 contemplated converting all salaried pharmacists (including Dr. Lee) to hourly employees.

During the call on March 22, 2020, Mr. Wentzell, Ms. Jansson, and Mr. Mackiernan discussed the reduction in force options and decided which employees to terminate. They decided to keep one pharmacist at each dispensary location. Defendants claim they chose Dr. Lee for termination for financial reasons because she was "the only salaried pharmacist (and highest paid employee) at the Phoenixville location and the only one who was grandfathered into the bonus program." (ECF No. 28 at 15.) Mr. Wentzell also testified that an employee's availability to work factored into the decision-making process, and he acknowledged that all of the employees who were unavailable to work were terminated. This included Dr. Lee, who was out of work due to her anxiety.

The next day, March 23, 2020, Dr. Lee wrote to Ms. Jansson and asked her to send FMLA forms to her physician, Dr. Reekie, to fill-out. A few hours later, Mr. Wentzell emailed Dr. Lee with a letter, terminating her employment.

**B.     Procedural History**

On May 5, 2020, Dr. Lee filed an administrative complaint against "Bay, LLC d/b/a Cure Pennsylvania" with the Pennsylvania Human Relations Commission. (ECF No. 30-32.) She filed an amended complaint in September 2020. Cure Solutions's employee, Ms. Jansson, received both complaints and forwarded them to Cure Solutions's CEO. Cure Solutions dealt with the complaints on behalf of all three entities.

On November 18, 2021, Dr. Lee brought suit against Bay, Cure Solutions, and Cure PA. Thereafter, she filed a First Amended Complaint, asserting claims for discrimination and retaliation in violation of the Americans With Disabilities Act, the Family Medical Leave Act, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinance. Dr. Lee also asserted a claim of FMLA interference. Following discovery, Defendants filed a Motion for Summary Judgment as to all of Dr. Lee's claims. The Motion is ripe for disposition.

**II.    LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B).

## III. DISCUSSION

### A. PFPO Exhaustion

The PFPO imposes an administrative exhaustion that requires potential plaintiffs to file a complaint with the Philadelphia Commission on Human Relations before filing a lawsuit. *See* Phila. Code § 9-1112(1). It is not enough to file a complaint with PHRC because the PFPO has no provision to permit dual-filing with another agency. In fact, the PFPO bars the PCHR from accepting a complaint from anyone who has filed a complaint with the PHRC. *See* Phila. Code § 9-1112(4). (The PFPO doesn't say so, but presumably this includes complaints that are dual-filed at the EEOC, given that the law deems such a complaint to have been filed with the PHRC.) Dr. Lee didn't file a complaint with the PCHR, so she didn't satisfy the PFPO's exhaustion requirement. Seems simple enough.

7

Dr. Lee claims it's not that simple, though. She claims that courts should excuse exhaustion under the PFPO when someone files with the PHRC. To get there, she points to Section 1122, which provides that nothing in the PFPO "limits the right of an injured person to recover damages under any other applicable law or legal theory." Phila. Code §9-1122(4). According to her, that provision, together with Section 1112(4)'s prohibition on accepting complaints from those who have filed with the PHRC, indicates that the Philadelphia City Council intended to allow claims under both the PFPO and the PHRA, even without exhaustion under the PFPO.

The PFPO's unambiguous language does not support Dr. Lee's reading. *First*, the law contains no exception to its exhaustion requirement for situations when someone filed with the PHRC. *Second*, Section 1122(4) doesn't preserve claims under the PFPO. It provides that that the PFPO does not prohibit recover under "any other applicable law or legal theory." *Id.* That is, the PFPO preserves a plaintiff's ability to seek relief under statutes **other than** the PFPO, not under the PFPO itself.

Maybe Dr. Lee is right that City Council intended a different result. But my focus must be the unambiguous words of the PFPO, not some nebulous notion of legislative intent. *See Robert D. Mabe, Inc. v. OptumRx*, 43 F.4th 307, 320 (3d Cir. 2022) ("If the statute's plain language is unambiguous and expresses Congress's intent with sufficient precision, we need not look further."). Indeed, Pennsylvania law commands that "[w]hen the words of a statute are clear and free from all ambiguity," a court must not "disregard[

8

the words] under the pretext of pursuing its spirit." 1 Pa.C.S.A.§ 1921(b). And, it's not at all clear that Dr. Lee is right about City Council's intent when it adopted the PFPO. It's possible that she's right. But it's also possible that City Council intended the PFPO to supplement the PHRA, so that a plaintiff who did not have a remedy under the PHRA had somewhere to turn for recourse. In that scenario, there would be no reason for me to ignore the PFPO's exhaustion requirement.

I am aware that some Judges in this District have reached a different conclusion in interpreting the PFPO. *See, e.g., Vandergrift v. City of Phila.*, 228 F. Supp.3d 465, 482 (E.D. Pa. 2017). Respectfully, I disagree with the logic of those decisions, particularly their conclusion that the PFPO is ambiguous. None of the language of the ordinance is reasonably susceptible to different meaning, so there is no ambiguity. And, in the absence of ambiguity, there is no reason for me to move beyond the plain legislative language.

### B. Exhaustion Of ADA And PHRA Claims

"In order to bring suit under the ADA ... and PHRA, a plaintiff must first exhaust [her] administrative remedies" by filing a complaint with the Equal Employment Opportunity Commission or the relevant state agency, like the Pennsylvania Human Relations Commission. *Jacoby v. Bethlehem Suburban Motor Sales*, 820 F. Supp. 2d 609, 615 (E.D. Pa. 2011). Dr. Lee did not name Cure Solutions, Inc. as a respondent when she filed her administrative complaints with the PHRC. Instead, she identified Bay and Cure PA as the respondent(s). Nevertheless, Dr. Lee may proceed with her claims against Cure

Solutions, where Cure Solutions had notice of Dr. Lee's administrative complaints and has a common interest with the other Defendants who were named.

The Third Circuit has recognized an exception to the administrative exhaustion requirement, holding that a plaintiff may bring a claim against a party that was not named in the administrative charge if "the unnamed party received notice and when there is a shared commonality of interest with the named party." *Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh, Pa.*, 903 F.2d 243, 252 (3d Cir. 1990). Courts apply this exception to ADA matters. *See, e.g.*, *Kern v. Phoenixville Hosp., LLC*, 342 F.R.D. 324, 329 (E.D. Pa. 2022). In making this determination, courts consider: "1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar [to] the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; [and] 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party." *Id.* (quotation omitted).

These factors favor permitting Dr. Lee to assert claims against Cure Solutions, despite not having named this Defendant in her administrative complaints. Dr. Lee has presented evidence that she provided notice to Cure Solutions by serving her PHRC

complaint on one of its employees, Lorie Jansson. Ms. Jansson forwarded both Dr. Lee's original PHRC complaint and her amended complaint to Cure Solutions's CEO. In fact, Cure Solutions handled Dr. Lee's legal claims. There is also a commonality of interest between Cure Solutions and its wholly-owned subsidiary Cure PA, and Dr. Lee named Cure PA as a respondent. It therefore made little difference that Cure Solutions was not named in the complaint itself.

### C. Joint Employer Status

To be subject to the ADA, an "employer" must be "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year[.]" 42 U.S.C. § 12111(5)(A). Likewise, an "employer" subject to the FMLA is "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.]" 29 U.S.C. § 2611(4)(A)(i).

Employees may proceed with their claims under the FMLA and ADA by relying on a "joint employer" theory of liability. *See* 29 C.F.R. § 825.106(a) ("Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA."); *Pickney v. Modis, Inc.*, No. 22-cv-1822, 2022 WL 17652698, at *4 (E.D. Pa. Dec. 13, 2022) ("[C]ourts in this circuit have recognized that joint employer liability also exists under the ADA and the PHRA."). If

applicable, the joint employer theory permits a plaintiff to aggregate the number of employees of both employers, for purposes of satisfying the requirements of the relevant statutes.

>    For purposes of the FMLA:
>
>    [A] joint employment relationship generally will be considered to exist in situations such as:
>
>    > (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>    >
>    > (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,
>    >
>    > (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 825.106(a). No one criterion is dispositive, and the court must consider the entire relationship in its totality. *See* 29 C.F.R. § 825.106(b)(1). To determine whether joint employer liability might exist under the ADA, courts consider whether the alleged employer has: "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." *Pickney v. Modis, Inc.*, No. 22-cv-1822, 2022 WL 17652698, at *4 (E.D. Pa. Dec. 13, 2022) (quoting *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 469 (3d Cir. 2012)).

Again, courts look to the totality of the circumstances when considering whether a joint employer relationship exists.

Dr. Lee has pointed to enough facts to suggest that Cure Solutions was a joint employer with Bay. Cure Solutions provided management support services to Bay pursuant to a contract with Cure Solutions's wholly-owned subsidiary Cure PA. As part of the management agreement, Cure Solutions's employee, Ms. Jansson, "provid[ed] various day-to-day HR operations and guidance" to Bay, such as handling leave requests and payroll for Bay's employees. (ECF No. 35-32 at 31:5-7.) Another Cure Solutions employee, Mr. Wentzell, served as Bay's Regional Director. In that role, all Bay employees (including Dr. Lee) reported up to Mr. Wentzell, and he had the ability to hire and fire them. In fact, Mr. Wentzell, along with Ms. Jansson, was part of the team that decided to terminate Dr. Lee, and he issued her termination letter. Cure Solutions's CEO, Mr. Mackiernan, was also part of the team that made the termination decisions for Bay employees. These facts——which demonstrate that Cure Solutions was managing the employees and operations at the various Bay locations——create a genuine dispute as to whether Cure Solutions is a joint employer with Bay.

However, Dr. Lee has not come forward with sufficient evidence to create a question as to whether Cure PA might also be a joint employer. The mere fact that Cure PA was the counterparty to the management contract with Bay is insufficient because Cure PA had no employees of its own, and Cure Solutions provided the actual

management services to Bay. Also, Cure PA's status as Cure Solutions's wholly-owned subsidiary is not enough to treat both entities as one and the same. Because there is no dispute that Cure PA was not Dr. Lee's employer, I will enter summary judgment against Cure PA on all of Dr. Lee's claims.

### D. Disability Discrimination

To prevail on her claims of disability discrimination, Dr. Lee must demonstrate that she was (1) disabled, (2) subject to an adverse employment action, (3) qualified for her position, and (4) that the adverse employment action was because of her disability. *See Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021). If she can make that showing, then the burden shifts to Bay and Cure Solutions "to provide a legitimate, non-discriminatory reason for [their] actions." *Id.* (citation omitted). Once they do so, Dr. Lee "may prevail at summary judgment only if she has evidence that [the articulated reason] is merely a pretext[.]" *Id.* (same). Defendants do not challenge Dr. Lee's ability to make out a *prima facie* case of discrimination, so I limit my inquiry to pretext.

Bay and Cure Solutions claim that they terminated Dr. Lee because she was "the only salaried pharmacist (and highest paid employee) at the Phoenixville location and the only one who was grandfathered into the bonus program." (ECF No. 28 at 15.) That constitutes a legitimate, nondiscriminatory reason for their decision.

To establish pretext, Dr. Lee must point to "evidence that could cause a jury 'either [to] (1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an

14

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quotation omitted). Dr. Lee has pointed to evidence in the record that could cause a jury to disbelieve Defendants' proffered reason for terminating her.

*First*, one of the decision-makers, Mr. Wentzell, testified that an employee's availability to work factored into the decision-making process, and he acknowledged that all of the other employees who were unavailable to work were terminated. In fact, when he presented the reduction-in-force options to Mr. Mackiernan and Ms. Jansson, Mr. Wentzell listed the employees' availability to work next to their names, suggesting that unavailability played a significant role in the termination decisions. Because availability is different from the reason that Defendants offer, it gives the jury a reason to disbelieve the stated reason.

*Second*, Defendants contend that they selected Dr. Lee for termination due to her status as a salaried employee. While the reduction-in-force options contemplated converting all salaried pharmacists (including Dr. Lee) to hourly employees, Defendants terminated Dr. Lee and another salaried pharmacist but retained three other salaried pharmacists and converted them to hourly pay. That fact suggests that Dr. Lee's salaried status wasn't such a disqualifying factor after all.

*Third*, Defendants contend that they terminated Dr. Lee because she would have been eligible for bonuses, but Dr. Lee has come forward with evidence demonstrating

15

that at least three other employees continued to receive bonuses after the reduction-in-force.

A reasonable jury hearing this evidence could determine that Defendants' reason for terminating Dr. Lee——her salaried status and bonus eligibility——was not the actual reason she was terminated. That is, there's reason for a reasonable juror to disbelieve Defendants' stated reason. The same evidence creates a question of fact as to the pretext prong of Dr. Lee's claims of retaliation under the ADA and FMLA as well. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022) (setting forth the same standard for establishing pretext in ADA and FMLA retaliation claims). As a result, Defendants are not entitled to summary judgment on those claims for lack of pretext.

### E. Failure To Accommodate

To make out a failure-to-accommodate claim, Dr. Lee must be able to establish: "(1) [s]he was disabled and [her] employer knew it; (2) [s]he requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quotation omitted). Defendants' argument that Dr. Lee cannot prevail on her claim fails because it rests on the assumption that Dr. Lee did not request an accommodation until she asked Ms. Jansson to send FMLA forms to her doctor on March 23, 2020, after Defendants had decided to terminate her.

However, a reasonable jury could determine that Dr. Lee requested an accommodation to take an extended leave as early as March 16, 2020, when she asked her manager, Gabrielle Mazza, for "information regarding short term disability leave." (ECF No. 35-11.) Dr. Lee also texted Ms. Mazza and told her that she was experiencing "extreme anxiety" and may "need to take PTO and/or disability leave." (ECF No. 30-13.) That same day, Dr. Lee emailed Ms. Jansson, asking for information "regarding medical leave benefits." (ECF No. 30-12.) When Ms. Jansson clarified as to whether Dr. Lee was inquiring about FMLA leave, Dr. Lee confirmed that she was. Indeed, Ms. Jansson understood Dr. Lee to be requesting FMLA leave as of that time and sent her an FMLA form to complete.

Later that night, Dr. Lee wrote to Mr. Wentzell and advised him that she saw her doctor that day "because I need help processing the amount of the past weeks' unprotected exposure and risk of transmission to my family **and to initiate FMLA**." (ECF No. 30-16 at page 3 of 4 (emphasis added).) While Dr. Lee accepted Mr. Wentzell's offer to use her PTO, she also anticipated the possibility of needing additional time off to deal with anxiety and asked him: "In the event I still feel I am unable to return to the dispensary, will I have the option, at that time, to apply for a medical leave?" (*Id.*) Mr. Wentzell understood that Dr. Lee was suggesting that she might need to be out longer than her two weeks of PTO would cover. (ECF No. 35-7 at 164:21 – 165:1.)

Taken together, all of this evidence could lead a reasonable jury to conclude that Dr. Lee requested a leave of absence (beyond her accrued PTO) as an accommodation for

17

her disability *before* Defendants decided to terminate her employment. As a result, I will not grant summary judgment on Dr. Lee's failure to accommodate claim.

### F. Retaliation

To establish any of her retaliation claims, Dr. Lee "must establish a prima facie case by showing '(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Canada*, 49 F.4th at 346 (quotation omitted). Defendants contend that Dr. Lee cannot establish the causation element, but, again, that argument fails because it is premised on the assumption that Dr. Lee requested a leave of absence to deal with her anxiety only after Defendants had decided to terminate her.

As set forth above, however, a reasonable jury could determine that as of March 16, 2020, Dr. Lee had requested FMLA leave and/or an extended leave of absence that went beyond her accrued PTO, and she made this request six days before Defendants decided to fire her. As a result, there is a genuine dispute of fact as to whether there is a causal connection between her request to take leave and her termination.

### G. FMLA Interference

To prevail on her claim of FMLA interference, Dr. Lee must prove that (1) she was an eligible employee under the FMLA; (2) Defendants were subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to Defendants of her

intention to take FMLA leave; and (5) Defendants denied her benefits to which she was entitled under the FMLA. Dr. Lee has enough evidence that could lead a jury to conclude that she suffered from a serious health condition when she requested leave on March 16, 2020, making her entitled to leave under the FMLA.

"For purposes of FMLA, serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves … continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.113(a). In turn, "incapacity" refers to an "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). Relevant here, "[a] serious health condition involving continuing treatment by a health care provider includes … [a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves … [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.115(a)(2). "A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) …." 29 C.F.R. § 825.113(c).

Dr. Lee has pointed to enough evidence in the record to create a genuine dispute as to whether she was suffering from a serious health condition as of March 16, 2020, when she requested FMLA leave. *First*, there is no dispute that Dr. Lee was suffering from

anxiety as of that day. *Second*, Dr. Lee was incapacitated, as she was unable to work for more than three consecutive days. She also presented unrebutted expert testimony that her anxiety had become "debilitating" by March 16, 2020. (ECF No. 35-13 at 11.) *Third*, she received treatment from her health care provider, Dr. Thomas Reekie, that day, and Dr. Reekie diagnosed her with severe anxiety and prescribed her an increased dosage of Xanax to manage her symptoms. All of these facts are sufficient to create a question as to whether Dr. Lee suffered from a serious health condition and was entitled to take FMLA leave as of March 16, 2020, so Defendants are not entitled to summary judgment on Dr. Lee's claim of FMLA interference.

## IV.  CONCLUSION

When Dr. Lee filed her administrative complaint against Defendants, she lost the ability to bring suit under the PFPO, so Defendants are entitled to summary judgment on that claim. In addition, where there is no evidence in the record to support a finding that Cure Pennsylvania, LLC was Dr. Lee's employer, Cure PA is entitled to summary judgment on each of the claims asserted against it. However, Dr. Lee has come forward with enough evidence to overcome summary judgment on her remaining claims against Bay, LLC and Cure Solutions, Inc. An appropriate Order follows.

**FOR THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

**Date:**  February 13, 2023